**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| IN RE TANGOE, INC., SECURITIES LITIGATION | Civil Action No. 3:17-cv-00146-VLB |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Lead Plaintiff James Alpha Multi Strategy Alternative Income Portfolio respectfully submits this Memorandum of Law in Support of Lead Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement.

## I. INTRODUCTION

Lead Plaintiff and defendants Tangoe, Inc. ("Tangoe"), Albert Subbloie, Jr. and Gary Martino (collectively, "Defendants") have agreed to settle this case for two million five hundred and fifty thousand U.S. dollars ($2,550,000.00).[1] By this motion, Lead Plaintiff respectfully requests that the Court take the first step in its approval process[2] and enter an order: (i) granting preliminary approval of the proposed Settlement; (ii) certifying, for settlement purposes only, the proposed Settlement Class; (iii) approving the Parties' proposed form and method of giving notice to the proposed Settlement Class; and (iv) setting a date for a Settlement Hearing and deadlines for mailing and publication of the Notice, the filing of Settlement Class Member objections, the filing of Settlement Class Member opt-out notices, the filing of Lead Plaintiff's Motion for Final

[1] Lead Plaintiff and Defendants will be referenced collectively herein as the "Parties." All capitalized terms used herein have the meanings set forth and defined in the Stipulation and Agreement of Settlement (the "Stipulation"). A true and correct copy of the Stipulation and its exhibits (Exhibit A, A-1, A-2, A-3 and A-4 and Exhibit B) are altogether attached to the accompanying Declaration of Jacob Goldberg in Support of Preliminary Approval of Class Action Settlement ("Goldberg Decl.") as Ex. 1.

[2] Court approval of a class settlement is a two-step process. First, the Court must consider whether preliminarily to approve the settlement, as well as the content and method of providing notice to the proposed settlement class. Second, after preliminary approval and after notice has been issued to settlement class members consistent with the preliminary approval order, the Court must make a final determination as to whether the Settlement is fair, reasonable and adequate, such that the Settlement should be finally approved.

Approval of the Settlement, and the filing of Lead Counsel's application for attorneys' fees and expenses.

The proposed Settlement was achieved following arm's-length negotiations with the assistance of an independent mediator, Jed D. Melnick, Esq. of JAMS Alternative Dispute Resolution. As set forth herein, based on, *inter alia*, Lead Plaintiff's intensive investigation in connection with preparing an amended complaint; Lead Plaintiff's retention of experts to evaluate potential damages; and the Parties' preparation and exchange of formal mediation statements, Lead Plaintiff and its counsel had a thorough understanding of the strengths and weaknesses of its claims asserted in the Action, including the potential limitations on damages and recovery, prior to agreeing to accept the proposed Settlement.

The proposed Settlement represents an excellent recovery for Settlement Class Members. Lead Plaintiff estimates that the proposed Settlement returns approximately 20.24% of estimated damages. This is well above the median settlement for similar securities class actions. *See, e.g.,* Cornerstone Research, Securities Class Action Settlement 2016 Review and Analysis, at 7-8 (noting that in 2016, securities settlements overall returned a median of 2.5% of damages, with a higher median return of 7.3% where, as here, damages are less than $50 million). This Settlement far exceeds the normal ranges of reasonable approval and thus warrants preliminary approval. Likewise, Lead Plaintiff's proposed Notice satisfies the PSLRA's disclosure requirements and is the best practicable notice under the circumstances.

## II. SUMMARY OF THE LITIGATION AND SETTLEMENT

### A. Procedural History

On May 24, 2016, individual plaintiff Sarah Moleski filed a class action complaint in the United States District Court for the District of New Jersey ("New Jersey District Court"), asserting claims against Defendants on behalf of purchasers of Tangoe, Inc. securities between March 18, 2014 and March 7, 2016, and seeking to pursue remedies under the Securities Exchange Act of 1934. *See generally Moleski v. Tangoe, Inc.*, No. 2:16-CV-02957 (D.N.J. 2016) (hereinafter "*Moleski*").

On January 11, 2017, the New Jersey District Court appointed as Lead Plaintiff James Alpha Multi Strategy Alternative Income Portfolio and The Rosen Law Firm, P.A. and Finkelstein & Krinsk LLP as Lead Counsel (*Moleski* Dkt. No. 16).

On January 30, 2017, this case was electronically transferred by stipulation of the Parties from the New Jersey District Court to the United States District Court for District of Connecticut (Dkt. No. 22).

On June 23, 2017, the Parties filed a Joint Motion (Dkt. 52) informing the Court of their mediation session scheduled for July 27, 2017, and seeking a temporary stay of the Action pending the outcome of mediation.

On June 26, 2017, the Court granted in part the Parties Joint Motion and temporarily stayed this Action during the pendency of mediation proceedings. (Dkt. 53).

On July 27, 2017, certain of the Parties, their liability insurers and their counsel attended a full-day, in-person mediation session before Jed D. Melnick, Esq. of JAMS ADR in New York City, and arrived at an agreement in principal to resolve the Action through this Settlement.

On August 7, 2017, upon being notified by phone of the Parties' pending Settlement efforts, the Court entered an order directing the Parties to submit settlement terms for this Court's review and approval. (Dkt. 57). Lead Plaintiff now submits its Unopposed Motion for Preliminary Approval of Class Action Settlement in accordance with the Court's order.

### B. Settlement Negotiations

On July 27, 2017, Lead Plaintiff and Defendants attended a mediation before Jed D. Melnick, Esq. of JAMS in New York City. In the months leading up to this mediation session, Lead Plaintiff and Lead Counsel conducted an extensive investigation of the claims and the potential damages in this case, and retained multiple investigators as well as accounting and securities class damages experts. Shortly before the mediation session, Lead Plaintiff and Defendants exchanged detailed confidential statements and exhibits. Those statements and exhibits were also submitted to the mediator. After many hours of intensive mediation presentations and negotiations, the Parties were successful in achieving a resolution to this Action. The Parties extensive negotiations were at all times conducted at arm's length with the assistance and oversight of the mediator, who ultimately recommended and approved that the Parties settle the Action for a total of $2.55 million.

### C. Summary of Key Terms of the Proposed Settlement

#### 1. Relief to Class Members

In full and final resolution of all claims asserted in this Action, and all claims that have been or could have been asserted by Settlement Class Members or Lead Plaintiff against Defendants and the Released Parties, the Defendants shall transfer or cause

the Insurer to transfer two million five hundred and fifty thousand U.S. dollars ($2,550,000.00) in cash into a Settlement Fund, as set forth in the Stipulation filed contemporaneously herewith.

**2. Class Notice and Settlement Administration**

**a. Notice**

Within eighteen (18) calendar days of the entry of the Preliminary Approval Order, the third party Claims Administrator, Strategic Claims Services ("Claims Administrator" or "SCS") will transmit individual notice via mail, substantially in the form of the "postcard notice" attached to the Stipulation as Exhibit A-1 (the "Postcard Notice"), to each Settlement Class Member identified by records maintained by Tangoe or its transfer agent. SCS will also transmit Postcard Notice to all persons identified by banks, brokerage firms, or other nominees, as having purchased Tangoe common stock during the Settlement Class Period. The Postcard Notice prompts potential Settlement Class Members to view the long form notice ("Notice"), attached to the Goldberg Decl. as Ex. A-2, online or to contact the Claims Administrator to request a hard copy of the Notice. SCS shall complete the mailing as soon as practical, but in no instance later than fourteen (14) days prior to the Settlement Hearing. Lead Counsel, through the Claims Administrator, will cause the Settlement Stipulation and its Exhibits, this Order, and a copy of the Notice to be posted on the Claims Administrator's website within sixteen (16) calendar days after entry of this Order. The Claims Administrator will also publish the Summary Notice electronically on the *GlobeNewswire*, and also in print in the *Investor's Business Daily* within sixteen (16) calendar days after the entry of the Preliminary Approval Order.

The Notice describes in plain English the terms of the Settlement, the considerations that led Lead Counsel and Lead Plaintiff to conclude that the Settlement is fair and adequate, the maximum attorneys' fees award and expense reimbursement that may be sought, the procedures for objecting to and opting out of the Settlement, the proposed Plan of Allocation, and the date and place of the Settlement Hearing. This notice program will fairly apprise Settlement Class Members of the Settlement and their options with respect thereto, and fully satisfies constitutional due process requirements.

**b. Administration**

The Claims Administrator will administer distribution of the Net Settlement Fund pursuant to the Stipulation. In accordance with the Stipulation, Defendants shall pay or cause to be paid $2.55 million into an interest-bearing escrow account in a federally-chartered bank designated by Lead Counsel (the "Escrow Account"), to be controlled by Lead Counsel as Escrow Co-Agents for the benefit of the Settlement Class, with all interest to accrue for the benefit of the Settlement Class. Once the Settlement becomes final following entry of the Court's final judgment, substantially in the form attached to the Stipulation as Exhibit B (the "Judgment"), no monies shall revert back to Defendants.

**c. Costs of Notice and Administration**

Upon deposit in the Escrow Account of the Settlement Fund, the Escrow Agent may transfer up to one hundred and fifty thousand U.S. dollars ($150,000.00) from the Escrow Account to an interest-bearing account to be maintained by the Settlement Administrator, to pay reasonable and necessary Notice and Administration Costs. After the Settlement's Effective Date, without further approval from the Court, the Escrow Co-

Agents may disburse additional amounts up to a total of three hundred thousand U.S. Dollars ($300,000.00) from the Settlement Fund to pay for any necessary, additional Administrative Costs. For any additional Administrative Costs above three hundred thousand dollars, the Escrow Co-Agents will obtain Court approval.

**3. Opt-Out Exclusionary Provisions**

Any Settlement Class Member who wishes to object to the fairness of the Stipulation must, by the Opt-Out/Objection Deadline set forth in the Notice (*see* Exhibit A-2 of the Stipulation), file any such objection with the Court, and provide copies of the objection to Lead Counsel, Defendants' Counsel, and the Court. Any Settlement Class Member who does not file a timely objection to the Stipulation shall be foreclosed from seeking adjudication or review of the Stipulation by appeal or otherwise.

Any Class Member who wishes to be excluded as a Class Member may submit a written exclusion request to the Claims Administrator, postmarked no later than the Opt-Out/Objection Deadline.

**4. Release Provisions**

Upon the Effective Date noted in the Stipulation, Lead Plaintiff and each Settlement Class Member who does not timely exclude himself/herself/itself from the Settlement Class, including any other person acting on his/her/its behalf or for his/her/its benefit, shall be deemed to have released, waived, and discharged the Defendants and the Released Parties from the Released Claims, and expressly waived and relinquished the Released Claims, including any Unknown Claims.

**5. Attorneys' Fees and Expenses**

For their services rendered on behalf of the Settlement Class, Lead Counsel intend to seek an attorneys' fee award not to exceed 30% of the Settlement Amount ($765,000), as well as the reimbursement of reasonable expenses.

**6. No Admission of Liability**

Each of the Defendants denies any wrongdoing, and this Settlement shall in no event be construed or deemed to be evidence or an admission or concession on the part of any of the Defendants or the Released Parties with respect to any claim or allegation of fault or liability or wrongdoing or damage whatsoever, or any infirmity in the defenses that the Defendants have, or could have, asserted. Defendants expressly deny that Lead Plaintiff has asserted any valid claims as to any of them, and expressly deny any and all allegations of fault, liability, wrongdoing or damages whatsoever. Similarly, the Stipulation shall in no event be construed or deemed to be evidence of an admission or concession on the part of Lead Plaintiff of any infirmity in any of the claims asserted in the Action, or an admission or concession that any of the Defendants' defenses to liability had any merit. Each of the Parties recognizes and acknowledges, however, that the Action has been initiated, filed and prosecuted by Lead Plaintiff in good faith, and defended by Defendants in good faith, and that the Action is being voluntarily settled with the advice of counsel and the mediator, and that the terms of the Settlement are fair, adequate and reasonable.

## III. PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE

### A. Standards for Preliminary Approval

The law favors settlement, particularly in class actions and other complex cases because they tie up substantial judicial resources, use up the parties' time and money, and, in such cases, any resolution is often significantly delayed. *Palacio v. E*TRADE Fin. Corp.*, No. 10 Civ. 4030 (LAP) (DCF), 2012 U.S. Dist. LEXIS 88019, at *7 (S.D.N.Y. June 22, 2012) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)); *see also Spann v. AOL Time Warner, Inc.*, No. 02 Civ. 8238 (DLC), 2005 U.S. Dist. LEXIS 10848, at *18 (S.D.N.Y. June 7, 2005) ("[P]ublic policy favors settlement, especially in the case of class actions"); *Newberg on Class Actions* (Fourth) (2002) § 11.41 ("The compromise of complex litigation is encouraged by the courts and favored by public policy."). Due to the presumption in favor of settlement, and "[a]bsent fraud or collusion," courts "should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 U.S. Dist. LEXIS 57918, at *12 (S.D.N.Y. July 27, 2007). More explicitly, the Supreme Court has cautioned that in reviewing a proposed class settlement, courts should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981).

Where, as here, parties propose to resolve class action litigation through a class-wide settlement, they must request and obtain the Court's approval. *See* Fed. R. Civ. P. 23(e); *Wright v. Stern*, 553 F. Supp. 2d 337, 343 (S.D.N.Y. 2008). The typical process for approval of class action settlements is described in the *Manual for Complex Litigation* (Fourth) §§ 21.632-.634 (2004). The steps are:

1. Preliminary approval of the proposed settlement at an informal hearing;

2. Dissemination of mailed and/or published notice of the settlement and fairness hearing to all affected class members; and

3. A formal fairness hearing, or final approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement is presented.

This procedure, commonly employed by federal courts, safeguards class members' procedural due process rights and enables the court to fulfill its role as the guardian of the class members' interests. *See Newberg*, § 11.25 (quoting *Manual for Complex Litigation* (Second) (1985)). In the Second Circuit, courts will examine the negotiating process that led to the settlement. *Wal-Mart*, 396 F.3d 96 at 116. They will also determine whether the settlement's terms are fair, reasonable, and adequate, using the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).

Preliminary approval is merely the prerequisite to giving notice that "the proposed settlement … may be submitted to members of the prospective Class for their acceptance or rejection." *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corporation*, 323 F.Supp. 364, 372 (E.D. Pa. 1970). Accordingly, at this stage of the settlement process, the Court conducts only a preliminary evaluation to determine whether the proposed Settlement is within range of possible final approval. *See* 5 James Wm. Moore, *Moore's Federal Practice* ¶¶ 23.83[1], 23-336.2 to 23-339 (3d ed. 2002); *see also Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 86 (E.D.N.Y. 2007) ("Preliminary approval of settlements should be given if the settlement is the result of serious, informed and non-collusive negotiations and the proposed settlement has no obvious deficiencies, such as giving preferential treatment to class representatives, or

granting excessive attorneys fees.") (*quoting In re Medical X-Ray Film Antitrust Litig.*, 1997 WL 33320580, *6 (E.D.N.Y. Dec. 26, 1997)).

**B. The Settlement Negotiated By the Parties Receives a Presumption of Fairness**

"In evaluating the settlement, the Court should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation; a presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel . . . ." *Clark v. Ecolab Inc.*, Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672, 2010 U.S. Dist. LEXIS 47036, at *18 (S.D.N.Y. May 11, 2010) (citation omitted). Courts also give weight to the parties' judgment that the settlement is fair and reasonable. *See Palacio*, 2012 U.S. Dist. LEXIS 88019, at *8; *Diaz v. E. Locating Serv. Inc.*, No. 10 Civ. 4082, 2010 U.S. Dist. LEXIS 139136, at *10 (S.D.N.Y. Nov. 29, 2010), *Clark*, 2010 U.S. Dist. LEXIS 47036, at *18. *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975) ("While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement").

On July 27, 2017, the Parties participated in an all-day, in-person mediation before a nationally regarded mediator, Jed. D. Melnick, Esq. In advance of that session, the Parties exchanged and provided to the Mediator detailed mediation statements and exhibits addressing Defendants' potential liability and damages. During the mediation session, both sides made detailed, adversarial presentations about the merits of Lead Plaintiff's claims and the defenses to those claims. After numerous

debates, proposals and counterproposals between the Parties and their Mediator, the Parties were able to reach an agreement in principal at the end of the session. Negotiations were at all times hard-fought and at arm's length, and have produced a result that Lead Plaintiff and Lead Counsel believe to be in the best interests of the Settlement Class. The arm's-length nature of settlement negotiations and the supervision of an experienced mediator supports the conclusion that the Settlement is fair and achieved free of collusion. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure").

The proponents of the Settlement are highly experienced in this type of litigation and are intimately familiar with the legal and factual issues enmeshed in this case. *See* Rosen Firm and Finkelstein & Krinsk Resumes, Goldberg Decl. Exs. 2 and 3. As one court found in *Lyons v. Marrud, Inc.*, 1972 WL 327, *2 (S.D.N.Y. June 6, 1972), "[e]xperienced and competent counsel have assessed these problems and the probability of success on the merits. They have concluded that compromise is well-advised and necessary. The parties' decision regarding the respective merits of their positions has an important bearing on this case." The same is true here. In Lead Counsel's view, the Settlement provides substantial benefits to the Settlement Class, especially considering the expense, risks, difficulties, delays, and uncertainties of litigation, trial, and post-trial proceedings.

In addition, the Parties and their counsel were knowledgeable about the strengths and weaknesses of the case prior to their agreement to settle. Lead Plaintiffs conducted an extensive investigation prior to filing an amended complaint, which

included a thorough review of myriad publicly available information, including without limitation, the entirety of Tangoe's filings with the U.S. Securities and Exchange Commission ("SEC"), financial analyst and media reports, as well as public statements made by Defendants' themselves regarding Tangoe's business and financial condition. Further, Lead Plaintiff engaged its own accounting expert, damages expert, and professional investigators to fully and accurately assess the merit and value of Settlement Class claims. Lead Plaintiff also had the benefit of Defendants' mediation presentation setting forth their arguments and defenses on Lead Plaintiff's theories of liability, damages, and loss causation. As a result of these extensive efforts, Lead Plaintiff and Lead Counsel had an adequate basis for assessing the strength of the Settlement Class's claims and Defendants' defenses when they entered into the Settlement.

The Settlement does not provide preferential treatment to Lead Plaintiff or any other Settlement Class Members. The proposed Plan of Allocation set forth in ¶8 of the Notice, and developed by Lead Plaintiff's damages expert in consultation with Lead Counsel, provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms. The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Losses. Similar plans have repeatedly been approved by district courts within the Second Circuit. *See In re Citigroup, Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 386-87 (S.D.N.Y. 2013); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145-46 (S.D.N.Y. 2010).

For all these reasons, the Settlement was the product of a thorough, arm's-length process, and as such, enjoys a presumption of fairness. *See Thompson v. Metro Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003) ("A strong presumption of fairness attaches to proposed settlements that have been negotiated at arms-length.").

**C. The Settlement Benefit Falls within the Range of Possible Approval**

At the Settlement Hearing, in determining whether a settlement is fair, reasonable, and adequate, the Court will decide whether to approve the settlement under the factors articulated in *Grinnell*: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. 495 F.2d at 463. All nine factors need not be satisfied; rather, the Court should consider the totality of these factors in light of the particular circumstances. *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. at 61.

At the Preliminary Approval stage, however, the Court need not determine whether the Settlement should be approved. Rather, if the Court finds that the Settlement is "within the range of possible approval" that might be approved under *Grinnell*, it should then order that the Class be notified of the Settlement and given an opportunity to be heard, and that the Settlement Hearing be held. *See Manual for*

*Complex Litigation* (Fourth) § 40.42 (model preliminary approval order). Here, the Settlement substantially satisfies the test announced by *Grinnell*. Therefore, the Court should grant preliminary approval.

**1. The Complexity, Expense and Likely Duration of the Litigation**

The proposed Settlement provides the Settlement Class with substantial and certain relief, without the delay and expense of extensive motion practice, discovery, class certification, summary judgment, trial and post-trial proceedings. Due to the inherent complexity of securities litigation, and particularly the stringent requirements imposed by the Private Securities Litigation Reform Act of 1995's ("PSLRA") amendments to the Exchange Act, as well as supervening case law developments, including the Supreme Court's recent decision in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), prosecution of securities class action litigation is inherently complex and lengthy. This Action would have taken years to complete discovery and proceed through class certification, summary judgment and trial – all of which would be extremely expensive and risky for the Settlement Class. A jury would then have had to determine: (i) whether any remaining alleged representations/omissions were material; (ii) whether Defendants acted with scienter; (iii) whether Tangoe's stock traded in an efficient market, entitling Lead Plaintiff and other Settlement Class Members to a (rebuttable) presumption of reliance, including rebuttal evidence on price impact under *Halliburton*; and (iv) the artificial inflation of Tangoe's stock and how much of the alleged price decline was attributable to what Lead Plaintiff alleges were the disclosures of information correcting the alleged false statements, if any.

Moreover, not only would *any* recovery be uncertain, considering the near-certainty of appeals, any available recovery at all would be delayed by years.

**2. Stage of the Proceedings**

Proceedings in this Action were sufficiently advanced to provide Lead Plaintiff with a thorough understanding of the strengths and weaknesses of the Settlement Class's claims. Lead Plaintiff conducted an extensive investigation and consulted with accounting and damages experts on liability, damages and market efficiency issues. Although the parties did not engage in formal discovery, the Parties' mediation session, along with the extensive mediation statements prepared in conjunction therewith, allowed Lead Counsel the opportunity to assess the relative strengths and weaknesses of the parties' positions, and to negotiate accordingly. *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 426 (S.D.N.Y. 2001) ("To approve a proposed settlement . . . the Court need not find that the parties have engaged in extensive discovery. Instead, it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to intelligently make . . . an appraisal of the Settlement.") (quotation marks and citations omitted).

**3. The Risks of Establishing Liability and Damages**

There were substantial risks in prosecuting this Action, and further prosecution of this Action to trial would have yielded a limited recovery or no recovery at all. Although Lead Plaintiff believes its allegations have merit, this Court has previously found accounting-related allegations against these same Defendants insufficient to survive a motion to dismiss under the PSLRA's heightened pleading standards. *See generally Stein v. Tangoe, Inc.*, No. 3:13-cv-00286-VLB, Dkt. No. 92 (D. Conn. Sep. 30, 2014)

(dismissing securities fraud claims against Defendants premised on accounting violations). Even if Lead Plaintiff could survive the PSLRA's heighted pleading standards, Lead Plaintiff would still have to ***prove*** falsity, materiality, and scienter with respect to Defendants' purported misstatements, to both the Court's and a jury's satisfaction, which is notoriously difficult and risky.

Lead Plaintiff would have encountered loss causation defenses at the summary judgment phase, as well as at trial. Defendants would argue that Lead Plaintiff was foreclosed from using any alleged stock drops to prove loss causation, and Lead Plaintiff may have been forced to disaggregate any portion of the alleged price decline that arose from disclosures that corrected the fraud alleged by Lead Plaintiff, from those that pertained to other information disclosed on the same date. *See*, *e.g.*, *Police & Fire Ret. Sys. v. Safenet, Inc.*, 645 F. Supp. 2d 210, 228-29 (S.D.N.Y. 2009) (dismissing claims based on stock drop following press release for failure to "explain why the disclosure on page 8 – as opposed to all other information in the extended 12 page release – caused the price decline").

As previously noted, a material risk existed that certain Settlement Class Members' claims would be eliminated in their entirety. By contrast, the proposed Settlement assures a certain and immediate recovery.

**4. The Risks of Maintaining this Class Action Through Trial**

In opposing Defendants' forthcoming motion to dismiss, Settlement Class Members would face strong arguments from Defendants regarding (at minimum) falsity, materiality, scienter and loss causation. In connection with Lead Plaintiff's subsequent motion for class certification, the Settlement Class would face the risk of arguments by

Defendants regarding any potential factual dissimilarity of claims asserted by Lead Plaintiff and putative class members. If successful, such defenses would mandate myriad individual lawsuits, attempting to collect minimal amounts of damages. Even if a class were certified over Defendants' objections, such a litigation class would face multiple risks in proving the class-wide nature of Defendants' securities laws violations at trial.

Though certification of securities class actions is not unusual, it is by no means automatic. Thus, absent a settlement, the Settlement Class would remain at risk that any litigation class certification motion would be denied. And because the amounts of most Settlement Class Members' ***individual*** damages are very small, individualized litigation would not be economically feasible for damaged investors, and therefore most if not all Settlement Class Members would recover nothing even if their claims were strong on the merits.

**5. Reasonableness of the Settlement Fund**

The Stipulation provides for a Settlement Amount of $2.55 million to be paid into the Settlement Fund. Lead Plaintiff's consultation with its expert indicated that, based on the allegations in the complaint, class-wide damages using different models ranged from $5 million to $12 million, but likely closer to the lower end of that range. As compared to that range of damages, the Settlement represents an excellent result, returning approximately 50% of estimated damages (using the low end of the range) or approximately 21% of damages (using the high end of the range). As such, the Settlement falls well within the range of possible approval. *See*, *e.g.*, *Rite Aid*, 146 F. Supp. at 715 (citing studies indicating that the average securities fraud class action

settlement since 1995 has resulted in a recovery of 5.5%-6.2% of estimated losses); *In re Mego Fin Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (stating that even using the objector's damages estimates, a settlement of 14% would be fair); *Grinnell*, 495 F.2d at 455 n.2 ("In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."); Cornerstone Research, Securities Class Action Settlement 2016 Review and Analysis, at 7-8 (noting that in 2016, securities settlements overall returned a median of 2.5% of damages, with 7.3% where damages are less than $50 million).

## IV. THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES

In preliminarily approving the proposed Settlement, the Court must also consider whether to certify the Settlement Class for purposes of Settlement under Rules 23(a) and (b)(3). *See Amchem Products, Inc., v. Windsor*, 521 U.S. 591, 620 (1997) (trial court may disregard case management issues in certifying a settlement class, but the proposed class must still satisfy the other requirements of Rule 23). The proposed Settlement Class, which has been stipulated by the Parties, consists of: "all persons who purchased or acquired the securities of Tangoe during the Settlement Class Period of May 10, 2013 through June 16, 2017, inclusive, except that excluded from the Settlement Class are all: (i) Defendants and all officers and directors of Tangoe during the Settlement Class Period; (ii) blood relatives and household members of any Person excluded under section (i) of this definition; (iii) any entities affliliated with, controlled by, or more than 5% owned by, any person excluded under sections (i) and (ii) of this definition; [and] (iv) the legal representatives, heirs, successors or assigns of any

person excluded under subsections (i) through (iii) of this definition." Also excluded from the Settlement Class are those persons who submit valid and timely requests for exclusion from the Settlement Class in accordance with the Court's Preliminary Approval Order and the Notice provided to Settlement Class Members.

The Second Circuit has long acknowledged the propriety of certifying classes solely for settlement purposes. *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). Before granting preliminary approval of a class action settlement, however, the Court should determine that the proposed Settlement Class is proper for settlement purposes. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); *Manual for Complex Litigation* (Fourth) § 21.632. To certify a class, the Court must determine whether four threshold requirements of Federal Rule of Civil Procedure 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem*, 521 U.S. at 613. Additionally, the action must be maintainable under Fed. R. Civ. P. 23(b)(1), (2) or (3). *Id.* at 614. In certifying the Settlement Class, however, the Court need not determine whether the Action, if tried, would present intractable management problems, "for the proposal is that there be no trial." *Id.* at 620; *see also* Fed. R. Civ. P. 23(b)(3)(D). Here, the proposed Settlement Class meets all of the requirements of Rule 23(a) and satisfies the requirements of Rule 23(b)(3).

**A. Numerosity**

Rule 23(a)(1) requires a class be so large that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). Courts generally assume that the numerosity requirement is met in cases involving nationally traded securities. *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, *12 (S.D.N.Y. July 27, 2007).

Indeed, "numerosity is presumed at a level of 40 members." *Consolidated Raid Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). In this case, although the exact size of the Settlement Class is not yet known, the Parties agree that there are at least hundreds or thousands of members in the proposed Settlement Class. During the Settlement Class Period, Tangoe's stock was actively traded in an efficient market, the NASDAQ exchange, at substantial daily share volumes. Thus, Rule 23's numerosity requirement is clearly met.

**B. Commonality**

The commonality element of Rule 23(a)(2) requires that "questions of law or fact [are] common to the class." *EVCI*, 2007 WL 2230177, at *13. In a securities class action like this one, the commonality requirement "is applied permissively." *Id*. The test or standard for meeting the Rule 23(a)(2) prerequisite is qualitative rather than quantitative; that is, there need be only a single issue common to all members of the class. Therefore, this requirement is easily met in most securities cases. *Newberg on Class Actions*, § 3.10 (4th).

Where, as here, there are common questions of law and fact pertaining to whether false statements of material fact were made by Defendants, whether Defendants' made those statements with the requisite state of mind, and the causes of a decline in the market value of a company's securities, commonality is easily met. *See*, *e.g.*, *Amgen, Inc. v. Connecticut Ret. Plans and Trust Funds*, 568 U.S. 455, 475 (2013) ("[T]his Court has held that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified."); *Teachers' Retirement Sys. of Louisiana v.*

*ACLN Ltd.*, 2004 WL 2997957, *4 (S.D.N.Y. Dec. 27, 2004) (commonality satisfied by allegations that class members were injured by the same fraudulent scheme).

**C. Typicality**

Rule 23(a)(3) requires that a class representative's claim be typical of those of the members of the class. A representative's claim is typical if each class member's claim arose from the same course of conduct and is based on the same legal theories. "Typical," however, does not mean identical. *EVCI*, 2007 WL 2230177, at *13; *see also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 511 (S.D.N.Y. 1996) ("Typicality, however, does not require that the situations of the named representatives and the class members be identical.") (collecting cases).

The heart of this requirement is that a plaintiff and each member of the represented class have an interest in prevailing on similar legal claims. Assuming such an interest, particular factual differences, differences in the amount of damages claimed, or even the availability of certain defenses against a class representative may not render his or her claims atypical. *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990).

Lead Plaintiff is the proposed class representative in this case. As was the case with all other members of the proposed Settlement Class during the Settlement Class Period, Lead Plaintiff purchased Tangoe securities during the period from May 10, 2013 through March 7, 2016, inclusive, based on Defendants' allegedly false and misleading statements. Rule 23's typicality requirement is satisfied.

**D. Adequacy**

Rule 23(a)(4) requires that a representative party fairly and adequately protect the interests of the class. This requirement has traditionally entailed a two-pronged inquiry: first, whether the representative party's interests conflict with the interests of other class members, and second, whether the counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation. *EVCI*, 2007 WL 2230177, at *13. Pursuant to Federal Rule of Civil Procedure 23(g), the adequacy of class counsel is now considered separately from the the adequacy of the class representative. Both prongs of the adequacy requirement are satisfied here.

**1. Adequacy of the Proposed Class Representative**

The court-appointed Lead Plaintiff in this case does not have interests antagonistic to those of other proposed Settlement Class Members. Like other Settlement Class Members, Lead Plaintiff purchased Tangoe securities during the Settlement Class Period. Lead Plaintiff is seeking, on its own behalf and on behalf of all Settlement Class Members, to recover damages caused by Defendants' allegedly unlawful conduct. Lead Plaintiff's interests are manifestly congruent with and not antagonistic to the interests of other Settlement Class Members.

**2. Adequacy of the Proposed Class Counsel**

Rule 23(g) requires a court to assess the adequacy of proposed class counsel. To that end, the court must consider the following: (1) the work counsel has done in identifying or investigating the claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel brings to

representing the class. *Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 182 (S.D.N.Y. 2005).

Here, Lead Counsel is thoroughly experienced in prosecuting class actions as class counsel and/or lead counsel, having successfully prosecuted securities class actions in courts throughout the country. Courts have consistently found Co-Lead Counsel, The Rosen Law Firm, P.A. and Finkelstein & Krinsk LLP to be well suited as class counsel in securities class actions. A copy of the each firm's resume is attached as Exhibits 2 and 3 of the Goldberg Declaration.

### E. Common Questions Predominate and the Class Action Device is Superior to Other Methods of Adjudication

Upon meeting the threshold requirements of Rule 23(a), a plaintiff must establish that the proposed class meets the requirements of Rule 23(b)(3). To certify a class under Rule 23(b)(3), the Court should find that: "the questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Lead Plaintiff satisfies the predominance and superiority criteria of Rule 23(b)(3).

It is well established that in determining whether common questions predominate, the Court's inquiry should be directed primarily toward the issue of liability. "Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied." *Similow v. S.W. Bell Mobile Sys. Inc.*, 323 F.3d 32, 40 (1st Cir. 2003). When common questions represent a significant aspect of a case and can be resolved in a single action, class action status is appropriate. *See* 7A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d*, §

1788, at 528 (1986). "Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class." *Smilow*, 323 F.3d at 39. In the instant action, the existence of common questions predominates over individual issues, exemplified by the fact that if each class member were to bring an individual action, each would be required to demonstrate the same material omissions or misrepresentations in order to prove liability. *See Amgen*, 568 U.S. at 475 (2013) ("[T]his Court has held that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified."). Accordingly, this case illustrates the principle that the predominance requirement is "readily met" in many securities fraud class actions. *Amchem*, 521 U.S. at 625.

Factors relevant to a finding of superiority include:

(a) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(b) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class;

(c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(d) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

Many, if not most, of the Settlement Class Members are individuals for whom the prosecution of an individual damages action on their own behalf does not provide a realistic or efficient alternative to class litigation. Even the individualized losses of larger institutional investors such as Lead Plaintiff would be too small to justify the duration and expense of a complex securities case such as this. Accordingly, most if not all

Settlement Class Members have little or no interest in "controlling the prosecution or defense of separate actions." *Id.*

This United States District Court for the District of Connecticut is a desirable forum for resolving this dispute pursuant to 28 U.S.C. § 1391(d) because a substantial part of the alleged conduct complained of occurred within this District. Moreover, this Court has particular experience adjudicating securities class actions against the Defendants in this case. *Stein v. Tangoe, Inc.*, No. 3:13-cv-00286-VLB, Dkt. No. 92 (D. Conn. Sep. 30, 2014) (dismissing securities fraud claims against Defendants at the pleading stage). Additionally, as to Rule 23(b)(3)(D), Lead Plaintiff believes that no difficulties will be encountered in the Court's management of this Settlement.

For all of these reasons, a class action is the superior method of adjudicating this case, and therefore the requirements of Rule 23(b)(3) are satisfied. *See Smilow*, 323 F.3d at 41 ("The core purpose of Rule 23(b)(3) is to vindicate the claims of … groups of people whose individual claims would be too small to warrant litigation"). For purposes of this Settlement, Defendants do not dispute that the Settlement Class can and should be certified in accordance with Rule 23(b)(3). Therefore, the Court should preliminarily certify the proposed Settlement Class.

## V. THE PROPOSED NOTICE TO SETTLEMENT CLASS MEMBERS SATISFIES RULE 23(C)(2)(B)

"Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise,' regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)." *See Manual for Complex Litigation (Fourth)* § 21.312. To satisfy due process, notice to class members must be "reasonably calculated, under all the

circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "'The notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance.'" *Soberal-Perez v. Heckler*, 717 F.2d 36, 43 (2d Cir. 1983) (quoting *Mullane*, 339 U.S. at 314). In securities class actions, it is customary to provide notice by (a) publishing a summary notice in a major publication, (b) publishing this same summary notice in a press release, (c) mailing long-form notice to all individual shareholders who can be found, and (d) publishing notice on a website. *See, e.g.*, *In re Marsh Erisa Litig.*, 265 F.R.D. at 145.

The Proposed Order Preliminarily Approving Settlement and Providing for Notice ("Preliminary Approval Order"), which is attached as Exhibit A to the Stipulation, requires Lead Counsel, within eighteen (18) calendar days of the Court's order preliminarily approving the Settlement, to provide notice to Class Members through mailing of the proposed Postcard Notice to all identifiable Settlement Class members, substantially in the form annexed as Exhibit A-1 to the Preliminary Approval Order, together with a copy of the Proof of Claim and Release, substantially in the form annexed as Exhibit A-3 to the Preliminary Approval Order, to be promptly mailed by first-class mail to each such Settlement Class members whose name and address are reasonably available. Fourteen (14) calendar days after entry of the Preliminary Approval Order, Lead Counsel shall cause a Summary Notice, substantially in the form annexed as Exhibit A-4 to the Preliminary Approval Order, to be published over the internet on *GlobeNewswire* and *Investor's Business Daily*.

The Notice meets the requirements of the PSLRA, 15 U.S.C. § 78u-4(a)(7). The proposed Notice, attached to the Preliminary Approval Order as Exhibit A-2, provides detailed information concerning: (a) the rights of Settlement Class Members, including the right to accept, object, or opt out of the Settlement; (b) the nature, history, and progress of the litigation; (c) the proposed Settlement; (d) the process for filing a proof of claim; (e) a description of the Plan of Allocation; (f) the fees and expenses to be sought by Lead Counsel and an incentive award to Lead Plaintiff; and (g) the necessary information for any Settlement Class Member to examine the Court records should they desire to do so. The Notice also sets forth instructions to securities brokers and other nominee holders for forwarding Notice to those persons for whom the nominees hold or held shares in street name. Additionally, the proposed Notice explains the procedures and deadlines for opting out of the Settlement or submitting objections or other comments.

The proposed Notice is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Thus, the proposed method of notice described above satisfies the requirements of due process as well as the PSLRA. *See*, *e.g.*, *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 173 (1974).

## VI. PROPOSED SCHEDULE OF EVENTS

Lead Plaintiff proposes the following schedule of events leading up to the Settlement Hearing as set forth in the Preliminary Approval Order filed herewith:

| EVENT | DEADLINE FOR COMPLIANCE |
|---|---|
| Date for Settlement Hearing. | 100-110 calendar days from entry of the Preliminary Approval Order. (Preliminary Approval Order ¶ 6.) |
| Defendants to provide a list of record owners of Tangoe securities | No later than fourteen (14) days after the entry of this Order (Preliminary Approval Order ¶13). |
| Mailing of Notice and Proof of Claim and Release to record owners of Tangoe | No later than 21 days after the entry of this Order (Preliminary Approval Order ¶¶13, 15). |
| Mailing of Postcard Notice. | As soon as practical after receiving lists of beneficial owners from nominees and custodians. (Preliminary Approval Order ¶17). |
| Publication of Summary Notice. | No later than fourteen (14) calendar days after the entry of Preliminary Approval Order. (Preliminary Approval Order ¶14). |
| Deadline for filing Proofs of Claim. | No later fourteen (14) calendar days prior the Settlement Hearing. (Preliminary Approval Order ¶ 21(a)). |
| Filing deadline for requests for exclusion. | Twenty eight (28) calendar days prior to the Settlement Hearing. (Preliminary Approval Order ¶23). |
| Date for Lead Plaintiff to file papers in support of the Settlement, the Plan of Allocation and for application for attorneys' fees and reimbursement of expenses. | Thirty five (35) calendar days prior to the Settlement Hearing. (Preliminary Approval Order ¶32). |
| Filing deadline for objections. | Twenty eight (21) calendar days prior to the Settlement Hearing. (Preliminary Approval Order ¶ 28). |
| Date for Lead Plaintiff to file reply papers in support of the Settlement, the Plan of Allocation and for application for attorneys' fees and reimbursement of expenses. | Seven (7) calendar days prior to the Settlement Hearing. (Preliminary Approval Order ¶ 33). |

This schedule is similar to those used in numerous other class action settlements and provides due process for the putative Settlement Class Members with respect to their rights concerning the settlement. The Court should schedule the Settlement Hearing for approximately one hundred (100) to one hundred ten (110) calendar days

after entering the Preliminary Approval Order in order for there to be sufficient time for mailing the Notice and Proof of Claim and Release, publishing Summary Notice, making requests for exclusion, filing Lead Plaintiff's motion in support of final approval of the Settlement and the Plan of Allocation and for application for attorneys' fees and reimbursement of expenses, filing any objections to the Settlement, filing any reply in support of final approval, and review by the Settling Parties of any requests for exclusion by Settlement Class Members.

## VII. CONCLUSION

Counsel for the Lead Plaintiff and the Defendants have reached this Settlement following extensive discussions and arm's-length negotiations. At this juncture, the Court need not answer the ultimate question: whether the Settlement is ultimately fair, reasonable, and adequate. At this time, the Court is merely being asked to permit Notice of the terms of the Settlement to be sent to the Settlement Class, and to schedule a hearing to consider any views expressed by Settlement Class Members, the fairness of the Settlement, and Lead Counsel's request for an award of attorneys' fees and reimbursement of expenses. *Moore*, supra, §23.83[1], at 23-336.2 to 23-339. Lead Plaintiff and Lead Counsel respectfully submit that the Settlement should be preliminarily approved and the proposed order entered.

For all of the above-stated reasons, Lead Plaintiff requests that the Court: (1) preliminarily certify the Settlement Class for purposes of the Settlement; (2) preliminarily approve the Settlement as set forth in the Stipulation; (3) approve the form and manner of Notice to the Settlement Class; and (4) set a Settlement Hearing date for final approval of the proposed Settlement.

Dated: October 3, 2017

Respectfully submitted,

**SHAPIRO LAW OFFICES, LLC**

*/s/ Jonathan M. Shapiro*
Jonathan M. Shapiro (ct24075)
32 Washington Street
Middletown, Connecticut 06457
Telephone: (860) 347-3325
Facsimile: (860) 347-3874
jshapiro@shapirolawofficesct.com

**THE ROSEN LAW FIRM, P.A.**
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com

**FINKELSTEIN & KRINSK LLP**

*/s/ Jeffrey Krinsk*
Jeffrey Krinsk (*pro hac vice*)
David J. Harris, Jr.
550 West "C" Street, Suite 1760
San Diego, CA 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425
Email: jkrinsk@classactionlaw.com

***Attorneys for Lead Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of October, 2017, a true and correct copy of the foregoing Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Jonathan M. Shapiro*